UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, WISCONSIN, the Commonwealth of MASSACHUSETTS, VIRGINIA, and the DISTRICT OF COLUMBIA *ex rel.*, COURTNEY CARLE, and NHCAOTZ, LLC, | § § § § § § § § § § § § § § § § § | Civil Action No. _____ |
| Plaintiffs, | § § § | 17CV966<br>JUDGE CASTILLO<br>MAG. JUDGE FINNEGAN |
| v. | § § § | |
| OTSUKA HOLDINGS CO., LTD., LUNBECK INC., PUBLICIS TOUCHPOINT SOLUTIONS, AMERISOURCEBERGAN CORPORATION, XCENDA, and THE LASH GROUP, | § § § § § § | **FILED**<br>FEB 06 2017 |
| Defendants. | § | THOMAS G. BRUTON<br>CLERK, U.S. DISTRICT COURT |

## COMPLAINT OF THE UNITED STATES

### FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730

The United States of America (the "United States") and the Plaintiff States (defined below) (the United States and Plaintiff States are collectively referred to herein as the "Government"), by and through their *qui tam* Relators, Courtney Carle ("Relator 1") and NHCAOtz, LLC ("Relator 2") bring this action under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*. (the "False Claims Act" or "FCA") and the false claims acts of the respective Plaintiff States against defendants Otsuka Holdings Co., Ltd. ("Otsuka"), Lunbeck Inc. ("Lundbeck"), Publicis Touchpoint Solutions, Inc. ("Publicis"), Amerisourcebergan Corporation ("Amerisource"), Xcenda, and The Lash Group ("Lash") (Amerisource, Xcenda and Lash are collectively referred herein as the "Reimbursement Vendors") (Otsuka, Lundbeck, Publicis and the Reimbursement Vendors are referred herein as "Defendants") to recover all damages, penalties, and other remedies provided by the False Claims Act, and analogous state statutes,[1] and for their complaint ("Complaint") allege:

---

[1]      Specific citations for relevant state *qui tam* statutes are as follows: California False Claims Act, Cal. Gov't Code § 12650 *et seq.*; Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*; Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*; Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; Illinois False Claims Act, 740 ILCS 175/1 *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*; Iowa False Claims Law, I.C.A. § 685.1 *et seq.*; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*; Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*; Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*; Montana False Claims Act, MCA § 17-8-401 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*; New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*; Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*; Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*; Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*; Massachusetts False Claims Act, Mass.

1. Based on the Relators' personal knowledge and further investigation, sufficient evidence exists to allege that Defendants have violated and continue to violate the False Claims Act, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute" or "AKS"), and the false claims acts of the respective Plaintiff States, by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of kickbacks paid in violation of the AKS and otherwise improper marketing of pharmaceuticals.

2. Kickback schemes generally involve two transactional parties: the "payer" and the "payee," who exchange remuneration for an illegal result. In the context of pharmaceutical sales, that illegal outcome is typically a "recommendation" made by the payee for business to the payer. Typically, the payer-drug manufacturer offers remuneration to the payee healthcare provider to make recommendations to patients by writing prescriptions for the payer's drug. Simply put, the drug company pays remuneration to a provider to induce the provider to prescribe (i.e. recommend) its drug to patients.

3. A drug company's violation of the AKS results in a false claim when the prescription is "presented" to a government healthcare program for payment by a pharmacy. Each time a pharmacy fills a patient's prescription for a drug paid for by a federal healthcare program, it "presents" a claim for payment to the Government. If the prescription was written as a result of remuneration paid in violation of the AKS, the claim is an actionable false claim pursuant to the AKS, 42 U.S.C. § 1320a-7b(g), and is also a violation of the FCA under the express or implied certification theory of liability.

---

Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*; Virginia Fraud Against Tax Payers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; and District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*

## PARTIES

4.     Relator 1 is a registered nurse ("RN") and former nurse educator for Abilify and Abilify Maintena ("Abilify"). Relator 1 was employed as a nurse educator by Publicis from July 2, 2012 until December 31, 2014, the day the contract between Otsuka and Publicis was terminated. Relator 1 is a resident of Nebraska.

5.     Relator 2 is a Delaware limited liability corporation formed to investigate and prosecute this matter. Relator 2's allegations are based on investigations, research, institutional knowledge, and conversations with several former Nurse Educators and Reimbursement Support staff employed by Defendants. These individuals are referred to herein as "CWs."

6.     Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. ("Medicare").

7.     The Plaintiff States are the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Washington, Wisconsin, the Commonwealths of Massachusetts and Virginia, and the District of Columbia. They each bring claims for Defendants' violations of their respective state false claims acts, as set forth in detail in the Counts, below.

8.     Otsuka is a pharmaceutical company headquartered in Rockville, Maryland. Otsuka markets dozens of drugs throughout the United States, one of which is the subject of this memorandum: Abilify Maintena (aripiprazole) ("Abilify"). Abilify is an injection used to treat schizophrenia, and is not to be confused with the oral version of the medication called, simply,

"Abilify."[2]  Abilify gained FDA approval on March 1, 2013.

9.　　　Lundbeck is a U.S. subsidiary of the Danish company H. Lundbeck A/S, which had revenues of $2.17 billion in 2015.  Lundbeck co-markets Abilify, and is headquartered in Deerfield, Illinois.

10.　　　Publicis provides recruiting, training, performance management, operations, compliance, and analytical support services to healthcare sector businesses, including Otsuka and Lundbeck.  Publicis also provides "Field Clinical Teams" to the pharmaceutical industry. Among the marketing services offered are "Clinical Health Educators" ("Nurse Educators"). Nurse Educators are licensed practical nurses and registered nurses who are employed by Publicis and used to support drug companies in the sale of drugs.  Here, Publicis hired nurses and outsourced them to Otsuka and Lundbeck to unlawfully promote Abilify. Publicis is headquartered in Yardley, Pennsylvania.  It is a subsidiary of Publicis Groupe SA, a multinational advertising and public relations company headquartered in France.

11.　　　Amerisource, through a subsidiary, Xcenda, employs teams of "Field Support" insurance and coverage experts that provide reimbursement support ("RS") services to providers in their offices.

12.　　　The Lash Group ("Lash"), another subsidiary of Amerisource, provides telephonic reimbursement support services ("RSS") in support of the field team.  Lash's website boasts that its services are "Making it Easier on The [provider's] Practice."

## JURISDICTION AND VENUE

13.　　　Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

---

[2]　　　"Abilify" as used herein shall refer to Abilify Maintena, and not Abilify.

14.     The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. § 3729 *et seq*., and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

15.     Pursuant to 31 U.S.C. § 3730(b)(2), Relators prepared and will serve the Complaint on the Attorney General of the United States, and the United States Attorney for the Northern District of Illinois, as well as a statement of all material evidence and information currently in its possession and of which it is the original source. These disclosure statements are supported by material evidence known to the Relators at the time of filing establishing the existence of Defendants' false claims. Because the statements include attorney-client communications and work product of Relators' attorneys, and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relators understand these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## **BACKGROUND**

### *The False Claims Act*

16.     The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

> (i) is presented to an officer, employee, or agent of the United States; or

> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

>> (I) provides or has provided any portion of the money or property requested or demanded; or

>> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

17.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

### *The Anti-Kickback Statute*

18.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A) and (B), prohibits offering to pay or paying any remuneration (including any kickback, bribe, or rebate) to any person

to induce such person "to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal healthcare program" or "to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." *Id.* Pursuant to the Anti-Kickback Statute, it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare and Medicaid. In order to ensure compliance, every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Statute and other federal laws governing the provision of health care services in the United States.

19.     For purposes of the AKS, "remuneration" includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. Importantly, the statute has been interpreted to cover *any arrangement where one purpose of the remuneration is to obtain money for referral of services or to induce further referrals.* *United States v. Kats*, 871 F. 2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F. 2d 68 (3rd Cir. 1985), cert. denied, 476 U.S. 988 (1985).

20.     A violation of the Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the Anti-Kickback Statute must be excluded from federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(b).

21.     Compliance with the Anti-Kickback Statute is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA. 42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the Anti-Kickback Statute] constitutes a false

or fraudulent claim for purposes of [the FCA]. . . ."); *see also United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 315 (3d Cir. 2011) (stating "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare" and holding that "appellants, by alleging that appellees violated the AKS while submitting claims for payment to a federal health insurance program, have stated a plausible claim for relief under the FCA.").

22.     The Anti-Kickback Statute was amended in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a violation of the Anti-Kickback Statute are also a violation of the FCA. 42 U.S.C. § 1320a-7(b)(g). The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148, § 6402(h).

23.     Compliance with the Anti-Kickback Statute is a condition of payment under federal health care programs.  Therefore, any violation of the Anti-Kickback Statute is a violation of the False Claims Act because claims seeking payment for services or prescriptions tainted by kickbacks are either "factually false" or "legally false," and therefore do not meet the conditions of payment from federal health care programs.

## SUBSTANTIVE ALLEGATIONS

### I.    Overview of Medicare and Its Benefits

24.     Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.

25.     Medicare Part D began January 1, 2006 and pays for prescription drug benefits for the elderly and disabled. 42 U.S.C. § 1395w-101 *et seq*.  All persons enrolled in Medicare Part A

10

and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D. HHS, through its component agency, CMS, contracts with private companies (or "sponsors") authorized to sell Part D insurance coverage. Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

26.     Medicare Part D requires all participants in the program – prescription drug plan ("PDP") sponsors, Pharmacy Benefit Managers ("PBM"), and pharmacies – to adhere to all federal laws and regulations, including those designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(h)(1). Under CMS regulations, PDP sponsors' subcontracts with PBMs and pharmacies must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(3)(v).

27.     The federal government's target is to pay 74.5% of the actual costs of basic prescription drug coverage (as defined at 42 U.S.C. § 1395w-1029(a)(3)). 42 U.S.C. § 1395w-115(a). Rather than a straight reimbursement, however, the government uses economic incentives and disincentives to encourage both beneficiaries and Part D Plan sponsors to reduce costs. 42 U.S.C. § 1395w-115.

28.     For beneficiaries, the disincentives for running-up high drug expenditures include requiring them to pay certain amounts out-of-pocket (in the aggregate referred to as a beneficiary's True Out-Of-Pocket ("TrOOP")). Those sums include:

   a) a beneficiary premium equal to 25.5% of the national weighted average plan bid, as adjusted (approximately $350), 42 U.S.C. § 1395w-113(a);

   b) a deductible defined as 100% of the first $250, as adjusted (although 90% of Part D Plans eliminate the deductible and use a tiered co-pay), 42 U.S.C. § 1395w-102(b)(1);

   c) thereafter a 25% copay on all costs up to the coverage gap, 42 U.S.C. § 1395w-102(b)(2);

d)  100% of costs between $2,250 and $3,600, as adjusted, 42 U.S.C. § 1395w-102(b)(3) & (4)  (the "coverage gap" or "donut hole"); and

e)  whereafter, the beneficiary enters the catastrophic coverage phase and only pays a copay of 5%, or $2 for a generic drug and $5 for any other drug. 42 U.S.C. § 1395w-102(b)(4)(A)(i).

29.     Because beneficiaries are required to pay a significant copay, and 100% of the cost of drugs while they are in the deductible and coverage gap phases of the program, Medicare Part D provides certain protections to beneficiaries.  For example, sponsors must make the negotiated prices available to beneficiaries regardless of what "phase" of the Part D benefit an enrollee is in (*i.e.* deductible, ordinary coverage, coverage gap or catastrophic coverage).  In addition, that negotiated price must also remain uniform within a particular pharmacy regardless of what phase of the program the beneficiary is in. Prescription Drug Benefit Manual, Ch. 5 "Benefits and Beneficiary Protections," § 20.6 ("the negotiated price for a particular covered Part D drug purchased at a particular pharmacy must always be the same regardless of what phase of the Part D benefit an enrollee is in").

30.     Another beneficiary protection is that, while they are in the deductible or coverage gap phases where they pay 100% of the costs, beneficiaries may avail themselves of a cash price that is better than their PDP's negotiated price if the pharmacy is offering a "'special' price or other discount for all customers, or if the beneficiary is using a discount card." Prescription Drug Benefit Manual, Ch. 14 "Coordination of Benefits," at 50.4.2.  If the beneficiary makes such a purchase outside of their plan, their expenditure will still count toward their TrOOP if they report it to their plan. *Id.*

31.     For Part D plan sponsors, the program is a quasi-free market model that uses a variety of incentives which are part of the structure of the program.  The starting point is that the program only pays the sponsor "interim payments . . . based on the Secretary's best estimate of

amounts that will be payable after obtaining all of the information." 42 U.S.C. § 1395w-115(d)(1).

In other words, Medicare Part D is not a capitated federal insurance program, but rather an actual

cost program. *Id.*; *see* 42 U.S.C. § 1395w-112(g) (prohibiting states from imposing premium taxes

on Part D subsidy since, unlike Part C, the payments are not capitated premiums); *compare to* 42

U.S.C. § 1395w-114(c)(2) (expressly authorizing capitated payment only for those Part D

beneficiaries in the lowest income tier who qualify for greater subsidy).

32.     In simplest terms, the sponsor submits a bid based on actuarial data estimating the

actual cost of providing prescription drugs to its pool of beneficiaries. The government then makes

"interim payments" to the sponsor on a monthly basis. As an express condition of receiving those

interim payments, the sponsor is required to submit to the government truthful and complete data,

including actual cost, for every prescription filled. At the end of each year the government then

compares its interim payments to the actual cost data, and determines whether the sponsor owes a

refund to the government, or whether the government is required to pay more money in order to

meet its subsidy target. In order to further incentivize the sponsor to keep costs down, however,

the refund or additional payment is first subject to risk corridors which penalize the sponsor if

actual costs exceed its bid, and reward the sponsor if actual costs are below its bid. 42 U.S.C. §

1395w-115(e). As a practical matter, these risk corridors would only slightly increase or decrease

the total percentage paid by the government for each prescription.

**II.     Overview of Medicaid and Its Benefits**

33.     Medicaid is a joint federal-state program created in 1965 that provides health care

benefits for certain groups, primarily the poor and disabled. The federal portion of each state's

Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on

the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the

states, the FMAP is at least 50 percent and is as high as 83 percent.

34.    The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS. 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ." See 42. U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

35.    The Medicaid programs of all states reimburse for prescription drugs. The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R.§ 430.30.

### III.    The TRICARE Program

36.    TRICARE is a managed health care program established by the United States Department of Defense. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to

14

eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by the Defendants.

## IV. The United States Food, Drug, and Cosmetic Act

37. The FDA regulates the manufacture, sale, and distribution of drugs and devices in the United States under the authority of the United States Food, Drug and Cosmetic Act ("FDCA"). The FDCA establishes the framework for regulation of, *inter alia*, the sales and marketing activities of pharmaceutical manufacturers in the United States. This authority includes oversight of promotional labeling and advertising for prescription drugs and restricted devices. 21 U.S.C. § 502.

38. The FDCA defines "label" to mean "a display of written, printed, or graphic matter upon the immediate container of any article . . . ." 21 U.S.C. § 321(k). "Labeling" means "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). For a prescription drug or device to comply with the FDCA's requirement of adequate directions for use, its labeling must contain, among other things, information addressing product hazards and other risk information, as specified in FDA regulations. 21 C.F.R. §§ 201.100(d)(1) & (3) and 801.109(d).

39. The FDCA also subjects advertising for prescription drugs and restricted devices to the disclosure of risk and other informational requirements. Advertisements for prescription drugs must include, among other things, "information in brief summary relating to side effects, contraindications, and effectiveness," as specified in FDA regulations. 21 U.S.C. § 352(n). Advertisements for restricted devices must include "a brief statement of the intended uses of the device and relevant warnings, precautions, side effects, and contraindications . . . ." 21 U.S.C. §

15

352(r).  Both prescription drug and restricted device advertisements also must not be false or misleading.  21 U.S.C. § 352(q)(1) & 321(n); 21 C.F.R. § 202.1(e)(5).

40.  Disease awareness communications are communications disseminated to consumers or health care practitioners that discuss a particular disease or health condition, but do not mention any specific drug or device or make any representation or suggestion concerning a particular drug or device. FDA Guidance for Industry (draft guidance), *"Help-Seeking" and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms* (January 2004).[3] Help-seeking communications are disease awareness communications directed at consumers. *Id.*

41.  Help seeking and disease awareness communications constitutes neither labeling nor advertising.  *Id.*  Therefore, help seeking and disease awareness communications are not subject to the disclosure of risk information and other requirements for labeling and advertisement communications under the FDCA. *Id.*

42.  The FDA will treat as a disease awareness communications any communications by or on behalf of a manufacturer, distributor, or retailer of a drug or device that:

    i.     discuss a disease or health condition;

    ii.    if consumer-directed, advise the audience to "see your doctor" for possible diagnosis and/or treatment;

    iii.   if aimed at health care practitioners, encourage awareness of signs of the particular disease or health condition, or otherwise provide information to assist in the diagnosis of the particular disease or health condition;

    iv.   do not mention a particular drug or device; and

---

[3]    On May 6, 2015, the FDA announced that it was withdrawing the draft guidance. *See* 80 Fed. Reg. 26059.  Thus, pharmaceutical manufacturers can now rely on two previously released industry policy guidance releases: Clarification of Policy on Institutional, Corporate, or Health Message Advertising (September 1985) and Institutional/Disease-oriented Advertisements (June 3, 1988).

v.     do not include any representation or suggestion relating to a particular drug or device.

*Id.*

43.     When a disease awareness communication is presented in a combination with a product promotion communication, in a way that causes the audience to perceive the two pieces as an advertisement or promotional labeling piece, a disease awareness communication may be treated by the FDA as labeling or advertising. *Id.* For example, a purported disease awareness communication disseminated by or on behalf of a drug manufacturer can be subject to the FDA's labeling or advertising requirements if it mentions a specific drug or contains a representation or suggestion concerning a specific drug or device. *Id.*

44.     In determining whether a disease awareness communication and promotional communication were disseminated in such a way as to trigger the FDA's advertising or labeling requirements, the FDA focuses on how the audience is likely to perceive the communication. Specifically, the FDA has stated that:

> a supposed disease awareness communication could be properly treated as advertising or promotional labeling if presented in combination with a product claim advertisement or promotional labeling piece in a manner that causes the pieces' messages to be linked together by the audience. In such a case, the combined communication would also communicate a particular product's indication and efficacy for a certain medical condition. If the combined communication does not comply with the act and FDA's advertising or labeling regulations, the communication would cause the promoted product to be misbranded.

*Id. See also* Enforcement Letter From FDA's Division of Drug Marketing, Advertising, and Communications to Schering Corp. (Aug. 18, 2000) (finding that two advertisements, a help seeking advertisement and a reminder advertisement, which immediately followed each other in a magazine, converted the entire presentation into one full product advertisement, subject to the

FDA's regulations)[4]; FDA Guidance for Industry, *Distributing Scientific and Medical Publications on Unapproved New Uses – Recommended Practices* (February 2014) (stating that scientific or medical journal articles and reference texts and clinical practice guidelines ("CPG") provided by pharmaceutical manufacturers to health care professionals should be distributed "separately from the delivery of information that is promotional in nature. For example, if a sales representative delivers a CPG to a physician in his or her office, the CPG should not be attached to any promotional material the sales representative uses or delivers during the office visit. To the extent that the recipients of the CPG have questions, the sales representative should refer the questions to a medical/scientific officer or department, *and the officer or department to which the referral is made should be independent of the sales and/or marketing departments*.") (emphasis added).

45.     Moreover, the FDA has identified two factors which it examines when determining whether two communications together qualify as promotional labeling or advertising. The two factors are: (1) Are the pieces perceptually distinct in use of graphic, visual, thematic, or other presentation elements; and (2) Are the pieces presented in close physical or temporal proximity? *Id.*

46.     Of these two factors, the FDA considers the determinant factor to be whether the pieces are perceptually distinct. In addressing this factor, the FDA recommended that manufacturers:

> ensure that their disease awareness communications and reminder promotional pieces or product claim promotional pieces are sufficiently distinctive in terms of their thematic, graphic, visual and other presentation elements so that they will not

---

[4]     This letter is available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Enforcement ActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM 166052.pdf.

be perceived as a single promotional piece that includes both a product name and a use, and is thus subject to the requirements for "labeling" or "advertising" mandated by the act and regulations.

*Id.*

47. Here, Defendants violated the FDA's for rules for labeling, advertising, and sales representative communications by simultaneously providing purported disease awareness communications and drug-specific promotional communications. This is due to, and evidenced by, in large part, the close collaboration between Nurse Educators and Otsuka's sales representatives.

## V. Defendants' Fraudulent Conduct

### A. False Claims Act Violations

48. Defendants have engaged in an unlawful marketing and kickback scheme with respect to its promotion of the drug Abilify that was intended to, and did in fact, induce physicians to improperly prescribe these medications. These prescriptions were reimbursed by federal health care programs, including Medicare, Medicaid and Tricare, and therefore were issued in violation of the Anti-Kickback Statute and the FCA. As a result of Defendants' misconduct, the government has been defrauded and suffered a substantial loss.

49. The first scheme is a *quid pro quo* arrangement whereby Otsuka and Lundbeck give "in kind" remuneration (i.e. coverage determinations and both field and telephonic RSS) to providers in order to induce those providers to recommend Abilify over competitors' drugs. In connection therewith, Otsuka and Lundbeck contracted with and paid remuneration to Publicis who in turn hired so-called "Nurse Educators" to unlawfully recommend Abilify to prescribers under the guise of education.

50. This second scheme detailed below is entitled "white coat" marketing. White coat marketing is a generic label attached to promotion of drugs and/or other healthcare services by

19

clinicians (i.e., doctors, nurses, therapists, etc). In many circumstances, as here, this conduct is unlawful (and unethical) because it intentionally seeks to "blurs the lines" between independent medical advice and sales. White coat marketing seizes on this to make a clinician's recommendation appear to be based on their independent medical judgment when in reality the recommendation is a result of the drug company's remuneration to the clinician. Here, between 2012 and January 2015, Otsuka has unlawfully paid tens of millions of dollars, annually, to third-party nurses whose job is to engage in white coat marketing.

51. The Nurse Educator and Reimbursement programs for Abilify is called the "Abilify Access and Assure Program." The program began in or around 2012 and included up to, and maybe more than, 60 Nurse Educators.

52. Sales of Abilify have been robust. In 2013, Medicare Part D reimbursement for Abilify totaled $21.3 million. Part B reimbursement data is unavailable, but it is believed many more millions in reimbursement for Abilify were paid by Medicare Part B. A large part of Abilify's blockbuster success can be directly attributed to the unlawful conduct detailed herein.

## B. Defendants Provided Reimbursement Support Services as an Inducement for Prescriptions

53. Otsuka and Lundbeck contracted with the Reimbursement Vendors to provide remuneration to providers who can prescribe Abilify, which was intended to induce providers to choose Abilify over a competitor's drugs. These RSS included coverage determinations, benefit verifications, prior authorizations, and coverage appeals. As detailed below, this remuneration is a tangible "in kind" benefit that greatly reduced and in some instances eliminated a provider's administrative costs related to prescribing Abilify.

54. The RSS included activities such as on-site training for provider reimbursement personnel, on-site assistance with reimbursement issues, and telephonic RSS support such as

patient insurance benefit verification services, patient prior authorization services and coverage appeals. From at least 2012 through the present, Lash, a subsidiary of Amerisource, has provided telephonic RSS for Abilify. During this same period, the majority of the field RSS were provided by Xcenda, another subsidiary of Amerisource. Xcenda's Abilify field reimbursement team included at least 15 members and, according to CW1, RS field representatives spent a majority of their time assisting providers in their offices.[5] After 2013, Otsuka, Lundbeck, and Publicis began assimilating the field RSS into the Nurse Educator role, going so far as to train Nurse Educators on RSS and arming them with an RS slide deck to offer the RSS to providers and their staff.

55.     Sales representatives, Nurse Educators, and Reimbursement Field Personnel marketed these services in order to increase the likelihood that prescribers would prescribe Abilify. Specifically, in exchange for prescribing Abilify, the Reimbursement Vendors would assume and underwrite the providers' administrative responsibilities and costs associated with starting a patient on Abilify. The more a provider prescribed Abilify as a percentage of its overall prescription volume, the greater the provider's savings of time and money, which would ordinarily be incurred by the provider, would now be undertaken by Otsuka, Lundbeck, and the Reimbursement Vendors. As described below, the RSS provided represented a material benefit worth approximately $50 to $80 per service. Instead of incurring this cost, drug representatives, Nurse Educators, and field RS personnel offer providers a means to "outsource" this function without any direct or indirect cost to the provider – but only if the provider chooses to recommend Abilify over competitors' drugs. In this way, Otsuka, Lundbeck, and the Reimbursement Vendor's RSS, both field and telephonic, were the "carrot" dangled to induce providers to choose to recommend Abilify over a

---

[5]     CW1 was employed by Xcenda, under its contract with Otsuka and Lundbeck, as an Abilify Field Reimbursement Director from 2012 until 2014.

competitor's drug.

### 1. Reimbursement Support Services are a Tangible Benefit to Providers

56.     RSS have a tangible value to providers because these services reduce, and in some instances eliminate entirely, a provider's administrative costs that are associated with prescribing drugs.  These services also help increase a provider's overall profitability. In particular, these services are of great value to "office-based" providers: those providers who derive most of their revenue from billing 15, 30, and 45-minute units of service provided to patients during office visits. The technical term for an office visit is "evaluation-and-management services" or "E/M" for short. In 2012, the most commonly billed Medicare physician service was the $70 "doctor office visit" for a 15-minute consultation, closely followed by the $100 "doctor office visit" for a 30-minute consultation. Medicare pays over $11 billion each year for E/M services alone.  Medicaid and private insurers also pay billions each year for E/M services.

57.     Whenever a patient is prescribed a drug following an E/M visit, the provider must attend to the inherent administrative functions associated with that prescription.  The provider's associated tasks include conducting a patient's prescription drug insurance benefit verification ("BV"), determining if the drug is on the formulary lists and tiers, seeking a coverage determination, determining co-pays and deductibles, telephone calls to patients, responding to patient complaints, returning messages and faxes, handling prescription refill requests and, when necessary, obtaining "prior authorizations" in addition to managing the resultant paper trail.  For years, industry research has demonstrated the enormous administrative costs and expenses incurred by providers when prescribing drugs.   Thus, due to these expenses, a portion of each provider's Medicare and/or Medicaid E/M reimbursement is intended to compensate a provider for the administrative costs associated with prescribing and managing a patient's medications.

58.     Importantly, office-based providers are not permitted to directly charge patients a fee for writing prescriptions, verifying a patient's drug prescription benefit or obtaining prior authorizations because the payer-physician contract prohibits charging such fees.

59.     As a provider's E/M reimbursement for each office visit is fixed per unit, providers are continuously seeking ways to combat overhead costs and expenses in order to earn more profit from each E/M unit billed. One way to accomplish this is to reduce the administrative costs associated with prescribing drugs. If a provider is successful in reducing this particular administrative cost, each E/M unit will be more profitable. These economics have a direct impact on providers' prescribing behavior. That is, providers are less likely to prescribe a drug that imposes an undue burden on support staff as those tasks would mean a decrease in profitability resulting from the need to hire more staff and/or to conduct fewer E/M visits with patients throughout the day. Conversely, a provider is much more likely to prescribe a drug if it can be prescribed with little or no administrative burden. Thus, the provider's relative cost and burden in prescribing one company's drug when compared to another company's drug can directly influence which drug a provider will recommend to a patient.

60.     These economic truisms certainly are not lost on pharmaceutical manufacturers like Otsuka and Lundbeck. As such, Otsuka and Lundbeck, through the Reimbursement Vendors, developed a concierge of RSS that are marketed to providers along with Abilify in order to increase the likelihood that providers choose to prescribe the drug. While these services cost millions of dollars to provide, Otsuka and Lundbeck readily incurred this expense, knowing that these services would act as a powerful inducement to providers to recommend Abilify over a competitor's drugs

### 2. Otsuka, Lundbeck, and the Reimbursement Vendors' "Pitching" of Reimbursement Support Services to Providers

61.     Defendants offered and provided RSS to providers to induce those providers to

23

prescribe Abilify to their patients. This was a powerful value proposition because, as described above, providers' staff are normally responsible for performing the tasks associated with obtaining patient drug coverage. As a result, Defendants' offer to perform these services, free of charge, was a valuable incentive to providers to prescribe Abilify.

62.     For example, according to the CWs, sales representatives, Nurse Educators, and field RS personnel were all trained to pitch these free RSS to providers to induce prescriptions. The pitch essentially went as follows:

> Dear office-based Part D Doctor: If you prescribe our drug, we will give you the services and resources of a full reimbursement support team to manage the administrative tasks associated with prescribing Abilify. These services will save you the cost and expenses normally associated with managing a patient's prescription and make your practice more profitable.

63.     This offer to "outsource" coverage determinations and other RSS was the value proposition offered to providers, and was a powerful tool in the hands of drug representatives, Nurse Educators, and field RS personnel, to induce providers to recommend Abilify.

64.     Nurse Educators or sales representatives were both trained to pitch Defendants' RSS to providers to convince them to prescribe Abilify, and in some instances would also bring an RS field representative with them on sales calls to provider's offices. Specifically, a sales representative or Nurse Educator would visit a provider's office, pitch Abilify to the provider, and discuss the RSS. Defendants even provided sales representatives and Nurse Educators with a presentation from Lash, and instructed them to use this presentation to show providers what RSS Defendants could provide. If the provider was interested, the Nurse Educator or sales representative would do a follow up visit with RS field representative, who would discuss with the provider the RSS they could provide in greater detail.

24

### 3. Abilify's Reimbursement Support Services are a Tangible Value to Providers

65.     Abilify costs an individual between $18,000 and $24,000 per year. Thus, for most, if not all patients, unless Abilify is covered by his/her insurance, the patient cannot afford this form of drug therapy.  Further, for providers who give the Abilify injection in their offices, the cost to buy Abilify as an up-front investment is substantial.  As a result, if a provider chooses to prescribe Abilify, the office staff must first determine the amount of his/her patient's prescription drug coverage or in-office Abilify injection coverage to pay for the drug. This function is called a "benefit verification" ("BV") and is performed daily by office-based staff as part of the administrative tasks associated with patient care. Performing BVs are complicated and time consuming. Indeed, it is not uncommon for office staff to spend over an hour making multiple calls simply to determine the nature and extent of a patient's insurance coverage for Abilify.  However, drug representatives, Nurse Educators, and field RS personnel offer, as part of their sales pitch, to perform this service for the provider's staff if the provider recommends Abilify over competitors' drugs. Further, according to CW2, an Xcenda field RS representative, sales representatives would pitch the free RSS to providers during sales calls and, if the provider was interested, an RS representative would be dispatched to the provider's office to explain the services in greater detail.[6]

66.     Each day, Lash's office receives electronic and fax requests from providers to perform BVs for their patients.  These requests are immediately forwarded to a Lash staff member that has training, education and experience in determining patient's prescription drug benefits. Upon receiving this request, the Lash specialist verifies the identity of the patient's primary and secondary insurance benefits (i.e. private insurance, Medicare, Tricare, and/or Medicaid).  Next,

---

[6]     CW2 was employed by Xcenda, under its contract with Otsuka and Lundbeck, as an Abilify Field Reimbursement Specialist from 2012 until 2013.

the Lash specialist directly contacts the carrier and verifies the nature and extent of the patient's drug benefit coverage or in-office Abilify injection coverage. In cases of Medicare and Medicaid, this is called a "coverage determination." For Medicare patients, a coverage determination is particularly cumbersome and time consuming given the complexity of many Part D plans that have four coverage phases.[7] For office based providers, Medicare's coverage determination process is particularly challenging and ordinarily consumes significant resources. Otsuka and Lundbeck understand this burden and offer to perform these tasks in order to induce the provider to recommend Abilify.

67.     In addition to the coverage determination services, Otsuka and Lundbeck, through Lash, also offer and perform "prior authorizations" for providers in order to induce the providers to recommend Abilify over competitors' drugs. A prior authorization requires that a provider first obtain prior approval from the patient's health insurance plan before prescribing certain medications. Part D and Part B carriers use the prior authorization process as a means to contain costs associated with expensive medications, like Abilify. That is, if a provider wants to recommend an expensive drug like Abilify, the Part D or Part B carrier will require that the provider "make the case" for prescribing the drug over a cheaper drug.

68.     The prior authorization process is particularly cumbersome and is widely reviled by office providers' staff because of the paperwork, time, and resources that must be expended to obtain a prior authorization for an individual patient. Further, even if a provider obtains a patient's

---

[7]     The four coverage phases under Medicare Part D are as follows: Deductible Phase – where a patient pays 100% for drug costs until the deductible amount; Initial Coverage Limit Phase – where a patient would pay a percentage of the cost depending on the carrier and the drug's formulary position; Coverage Gap, or "donut hole" Phase – where patients would pay 45% of the cost for brand-name drugs and 65% of the cost for generic drugs in 2015; and, Catastrophic Coverage Phase – where a patient pays either 5% of the covered drug cost or $2.65 for generics and $6.60 for brand name drugs in 2015.

Part D or Part B prior authorization, that prior authorization may only be valid for a limited time, such as for one year, and sometimes for only one month. After that, the provider's staff must start the prior authorization process over again. Given these burdens, providers will, in many cases, choose to recommend a medication that does not require a prior authorization.

69.     In addition to benefit verifications, coverage determinations, and prior authorization services, Otsuka and Lundbeck also offer "coverage appeal" services to induce providers to recommend Abilify over competitors' drugs. Any time a patient's drug plan either denies the patient coverage or denies the prior authorization request, Otsuka and Lundbeck, through Lash, will handle the provider's appeal of the drug plan's coverage determination, with the goal of reversing the denial and obtaining coverage of Abilify for the patient.

70.     Importantly, the tasks necessary to complete a prior authorization and/or coverage appeal always require that the provider give direct input regarding the patient's medical history, clinical and/or laboratory findings, and other information to establish the patient's medical necessity for a drug. Further, the provider and/or provider's staff must also develop specialized knowledge about each drug plan's unique prior authorization and/or coverage appeal criteria. In other words, a prior authorization and/or coverage appeal takes time and experienced personnel.

71.     According to CWs, Xcenda's field RSS personnel also work in providers' offices to directly assist providers who prescribed Abilify, and that they are a valuable resource for providers. The Xcenda field representatives provided these services without any charge to providers, and they worked in conjunction with Lash's free telephonic RSS.

72.     For example, after a provider decided to prescribe Abilify, a RS field representative would be deployed to the provider's office to ensure the provider received reimbursement for the drug. However, the RS representative would continue to assist the provider with reimbursement

related issues even after this visit. In addition to saving the provider time and resources, these services made providers feel more comfortable prescribing Abilify because Defendants provided a team of expert staff to ensure they received proper reimbursement.

73. Aside from the value providers received in terms of time and resources, Defendants' RS representatives also provided useful training that could be utilized for things other than receiving reimbursement for Abilify. For example, when Abilify was launched, RS field representatives trained providers on how to use a "J-code" for an unspecified drug.[8] This training was provided to providers' billing staff and, once learned, could then be utilized for numerous other medications recently approved by the FDA. Further, once a RS field representative was deployed to a provider's office, the office staff would typically ask a myriad of questions related to reimbursement issues for medications other than Abilify.

74. Nurse Educators and sales representatives were also trained to provide RSS, albeit much more limited than the RS field representatives. Indeed some of the CW Nurse Educators alleged that they spent nearly 50% of their time handling reimbursement issues for practices that prescribed Abilify.

75. CWs further confirm that the Reimbursement Vendors' RSS are utilized by nearly every provider who prescribes Abilify. These services have a tangible value to providers of saving time and money. Absent these services, a provider would be required to use his/her own staff and resources to help patients through the coverage determination, benefit verification, prior authorization, and coverage appeal processes. As already noted, above, providers are not permitted to charge a fee to patients for performing these services because the payer-provider contracts with

---

[8] J-Codes are HCPCS Level II codes used primarily for infusions and injections. Some J-Codes, such as J3490 (unclassified drug) and J3590 (unclassified biologic), are used when more specific codes are not available.

Medicare, Medicaid, and private insurances prohibit the provider from charging a patient a fee for these administrative services. If providers chose to outsource these services, they would be forced to independently contract with a private vendor and pay a transactional fee each time one of these services was performed. This fee ranges from $50 to $80 per service. Instead, drug representatives, Nurse Educators, and field RS personnel offer providers a means to "outsource" this function without any direct or indirect cost to the provider – but only if the provider chooses to recommend Abilify over competitors' drugs. As set forth above, by offering these in-kind services (i.e. a tangible benefit that saves time and money) as a means to induce providers to recommend Abilify over competitor drugs, Otsuka, Lundbeck, and the Reimbursement Vendors violated the AKS.

### 4. The Reimbursement Support Services, as Offered by Defendants, are Improper

76.     Defendants' scheme to provide free RSS violates the AKS. For decades, the Office of Inspector General ("OIG") has recognized the AKS ramifications presented by RSS that pharmaceutical companies offer to induce providers to recommend drugs. In 2003, the OIG undertook a comprehensive analysis of this and other questionable marketing practices. The OIG published its finding in a document entitled "Compliance Program Guidance for Pharmaceutical Manufacturers" ("CPG"). 68 Fed. Reg. 23731. The OIG CPG sets forth clear and detailed rules, many of which are applicable to Otsuka, Lundbeck, and the Reimbursement Vendors' conduct in this matter. Given its depth and complexity, a brief outline of the CPG's structure follows.

77.     In Section II (B)(2)(b), entitled "Kickbacks and Other Illegal Remuneration," the OIG analyzes the AKS and the "constraints it places on the marketing and promotion of [drugs] reimbursable by the federal health care programs . . . ." For ease of illustration, this section will be referred to as the "AKS section." In subsection B of the AKS section, the OIG identifies "Key Areas of Potential Risk" of AKS scrutiny. This subsection will be referred to as the "Potential Risk

section." Within the Potential Risk section, the OIG analyzes the potential risks involved with two separate groups of "relationship" partners, each of whom transact business with the pharmaceutical industry.

78.     The first group analyzed in this section by the OIG is "Purchasers and their Agents" which are transactional partners that purchase drugs from the pharmaceutical manufacturers. This group includes hospitals, nursing homes, pharmacies, "some physicians" and indirect purchasers (*e.g.*, health plans).  Importantly, the term "some physicians" in this section refers to providers who prescribe drugs reimbursed through Part B (i.e. "buy and bill" drugs). Unlike the office-based providers who prescribe Otsuka's Part D drugs *(e.g.*, Abilify), a Part B provider purchases drugs directly from a specialty pharmacy.  Once purchased, a Part B provider first administers the drug to patients and then submits a bill that includes reimbursement for the drug and its administration to the patient.

79.     For these Part B providers, the OIG allows pharmaceutical companies to provide limited coverage determination and reimbursement support that have no independent value.  The reason that coverage determination and reimbursement support for "buy and bill" Part B providers and other purchasers is permitted is that this group must make an initial financial investment in acquiring the drug.  OIG recognizes that this group may be reluctant to make this initial financial investment in an expensive drug for fear that it would not be able to recoup the initial outlay in the reimbursement process. Because of these financial risks faced by Part B providers, the OIG decided to strike a balance between that risk, and the risk of unlawful inducements, and thus specifically permitted limited support services that had no independent value to "buy and bill" providers and other purchasers. Thus, if the Reimbursement Vendors were only offering limited coverage determination and reimbursement support to "buy and bill" Part B providers, the conduct

would likely face less scrutiny by the OIG. However, as detailed herein, even the Part B prescribers received independent value through RS field personnel's provision of training to office staff, particularly in the use of J-codes, and the performance of RSS for the Part B offices by RS field personnel and Lash, saving them time and money.

80.     As detailed herein, the Reimbursement Vendors, since at least 2012, have been offering coverage determinations and RSS to both Part B "buy and bill" providers and Part D providers. In the CPG, the OIG addresses these Part D providers in a separate subsection of the Potential Risk section. These providers are analyzed in the subsection entitled "Physicians and Other Persons and Entities in a Position to Make or Influence Referrals." This group is comprised of "persons or entities in a position to refer, order, or prescribe—or influence the referral, ordering, or prescribing of—the manufacturers' [drugs]." This group includes the Part D providers who "recommend" (i.e. prescribe) drugs. Unlike Part B providers, the OIG specifically chose not to permit any coverage determinations and/or reimbursement support services for these Part D providers. Instead, the OIG urges particularly close scrutiny stating, in relevant part:

> Any time a pharmaceutical manufacturer provides anything of value to a physician who might prescribe the manufacturer's product, the manufacturer should examine whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward referrals. **For example, if goods or services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the physician),** or if items or services are sold to a physician at less than their fair market value, the arrangement may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer.

68 Fed. Reg. 23731 (emphasis added).

81.     The OIG's CPG prohibition of coverage determinations and RSS is similarly reflected in the Pharmaceutical Research and Manufacturers of America (PhRMA) Code on Interactions with Healthcare Professionals ("PhRMA Code") which specifically prohibits

subsidizing and/or supporting RSS for Part D providers. Section 13 of the PhRMA code, entitled "Independence and Decision Making," states as follows:

> No . . . subsidies, support, . . . or educational or practice related items should be provided or offered to a healthcare professional in exchange for prescribing products or for a commitment to continue prescribing products. Nothing should be offered or provided in a manner or on conditions that would interfere with the independence of a healthcare professional's prescribing practices.

82.     Thus, while pharmaceutical manufacturers have some limited leeway in their relationship with purchasers, including Part B providers, the industry does not have the same leeway in its relationships with office-based Part D providers who are in a position to "recommend" drugs to patients. Further, as explained herein, Otsuka and Lundbeck overstepped their limitied leeway in providing RSS to Part B providers.

### 5.  Conduct Related to Abilify Part B Reimbursement also Violate the AKS

83.     As discussed above, the OIG authorizes pharmaceutical companies to provide limited RSS that have no independent value to Part B, "buy and bill" providers.   Abilify can be reimbursed under either Medicare Part B or Part D.  Even though the OIG allows limited RSS for Part B drugs, Abilify's RSS, offered and provided by Otsuka and Lundbeck through the Reimbursement Vendors, violates the AKS because the RSS go beyond the limited services discussed by OIG and have an independent value to providers.

84.     As explained above, the Reimbursement Vendors performed services such as benefit verifications, prior authorizations, and coverage appeals, saving both Part B and Part D providers time and money.  These services have an independent value to providers. Therefore, these services go beyond the limited RSS allowed by OIG and violate the AKS because they have an independent value to providers.

### C.    Nurse Educators and White Coat Marketing

85.     In or around 2012, Otsuka and Lundbeck contracted with Publicis to employ nurses to help promote Abilify. The contract ended in January of 2015. This ultimately resulted in the deployment of roughly 60 Nurse Educators to gain access to providers in order to market and promote Abilify.

86.     According to CW3, the primary purpose of the Nurse Educators was to gain access to providers, especially providers who refused to see sales representatives, and promote Abilify.[9] Otsuka, Lundbeck, and Publicis needed a clever and nuanced approach to disguise this marketing strategy.     After all, Nurse Educators could not openly appear to act in the role of sales representative for several reasons. First, providers would potentially limit Nurse Educators' access in the same manner that sales representatives' access is being limited, thereby defeating the purpose of hiring Nurse Educators to gain better access than the sales representatives. Second, openly admitting that Nurse Educators were promoting drugs would force Otsuka, Lundbeck, and Publicis to limit their marketing activities to FDA approved materials only, or risk a charge of "off label" promotion, which was not an option as Otsuka, Lundbeck, and Publicis were banking on the Nurse Educators' personal relationships and "clinician to clinician" marketing to drive referrals. Third, the AKS prohibits pharmaceutical companies from paying non-employees to "recommend" its drugs to others.

87.     Otsuka and Lundbeck believed that by training Nurse Educators to be experts in Abilify's disease state, they were likely to be viewed by providers as more credentialed and thus more credible than drug representatives. Further, Otsuka and Lundbeck also correctly anticipated that Nurse Educators would leverage that credentialing and credibility to better overcome the

---

[9]     CW3 was employed by Otsuka as an Abilify Pharmaceutical sales representative ("drug rep") from 2012 until 2014.

office staff "gate keeper" and gain direct "peer to peer" access with providers and/or other staff members to promote Abilify over competitors.

88.     As these Nurse Educators were not employees (and also were not covered by any of the AKS's "safe harbor" provisions), Otsuka and Lundbeck could not openly pay Nurse Educators to exclusively recommend Abilify. Such an arrangement would openly violate the AKS. Similarly, Publicis would also be acting in violation of the AKS for being paid to recommend Abilify. For those reasons, and more, Otsuka, Lundbeck, and Publicis could not openly admit the Nurse Educators were paid to recommend Abilify.

89.     As a result, Otsuka, Lundbeck, and Publicis created a disease awareness program that would act as cover for the Nurse Educators – a program that could make Nurse Educators appear to be functioning distinct and independent from the role of a sales representative. Otsuka, Lundbeck, and Publicis designated the nurses as "educators" who, instead of being paid to recommend Abilify, were purportedly marketing and promoting free educational services to providers. Although "on paper" the Nurse Educators were called "educators" and employed by Publicis, the CWs all make clear that the nurses were paid to recommend Abilify.

90.     It was in this manner that the "Nurse Educator" role became the legal "fig leaf" to disguise the true role of the nurses: promoting and recommending Abilify. This scheme has been a tremendous success, and Abilify has grown into a leader in schizophrenia treatment as drug sales have skyrocketed.

91.     For illustration purposes, the channel of remuneration in this scheme is illustrated below:

Government-reimbursed healthcare items:

> Sales agents are in the business of recommending or arranging for the purchase of the items or services they offer for sale on behalf of their principals, typically manufacturers, or other sellers (collectively, "Sellers"). Accordingly, any compensation arrangement between a Seller and an independent sales agent for the purpose of selling health care items or services that are directly or indirectly reimbursable by a Federal health care program potentially implicates the anti-kickback statute, irrespective of the methodology used to compensate the agent. Moreover, because such agents are independent contractors, they are less accountable to the Seller than an employee.

OIG Advisory Opinion 98-10 (Aug. 31, 1998).

95.     Following this reasoning, HHS-OIG has list of suspect characteristics of independent sales arrangements:

- Compensation based on percentage of sales;
- Direct billing of Federal health care program by the seller for the item or service sold by the sales agent;
- Direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a federal health care program;
- Direct contact between the sales agent and Federal health care program beneficiaries;
- Use of sales agents who are healthcare professionals who are persons in a similar position to exert undue influence on purchasers or patients; or
- Marketing items or services that are separately reimbursable by a Federal healthcare program (e.g., items or services not bundled with other items or services exclusively by a DRG payment), whether on the basis of charges or costs.

OIG Advisory Opinion 98-10 (Aug. 31, 1998).

96.     In discussing these factors, OIG, in Advisory Opinion 98-10, specifically stated "[t]he more factors that are present, the greater the scrutiny we ordinarily would give an arrangement." OIG has continued to cite these same six illustrative factors in analyzing arrangements between providers and independent sales agents. *See* OIG Advisory Opinion 99-3 (Mar. 16, 1999).

36

97.     As described below, Defendants scheme to use Nurse Educators as sales representatives have several of the characteristics cited by the OIG as potentially suspect:

- The Nurse Educators' incentive compensation is linked to the sales volume of Abilify;
- Abilify is billed to Federal health care programs;
- Nurse Educators were contracted to be in direct contact with thousands of physicians and staff in a position to prescribe Abilify;
- Nurse Educators were healthcare professionals able to exert undue influence on providers; and
- Abilify is separately reimbursable by a federal healthcare program.

### 1.  Sales Training of Nurses Educators

98.     Each of the Nurse Educators underwent a rigorous training program and learned sales techniques, similar to the training each Otsuka and Lundbeck sales representative undergoes. The sales training provided to Nurse Educators was essential to the scheme's success because most, if not all nurses have little sales experience and/or training. And as Otsuka's and Lundbeck's ultimate goal was to drive sales of Abilify, it was crucial to teach Nurse Educators, employed by Publicis, the art of sales to achieve maximum success. The Nurse Educators were trained over a period of multiple weeks, including training at an Otsuka location in Princeton, NJ which also included Publicis trainers.

99.     The training provided to Nurse Educators was primarily focused on sales strategies. The Nurse Educators were taught sales techniques such as methods to overcome office gatekeepers, meeting sales objections, and other powerful influence strategies. According to Relator 1, her training was identical to the sales representatives' training. Specifically, the Nurse Educators were taught skills needed to effectively "detail" Abilify. This included providing Nurse Educators with the same materials that were provided to sales representatives. Each Nurse Educator was trained to use slide decks to present to providers: one was a branded Abilify slide;

37

one was on the disease state of schizophrenia; one was on reconstituting and performing the injection; one was on identifying patients for Abilify; and one was on Abilify reimbursement. The Nurse Educator CWs stated that each spent hours, over many days, practicing Otsuka's sales techniques. Nurse Educators also engaged in role playing exercises with each other and professional sales trainers, where they would detail Abilify and attempt to "close" the physician. Nurse Educators also participated in role play exercises on how to gain access to providers. In addition, in order to further the sales process, Nurse Educators were trained to use sales call tracking software including Veeva, SalesForce, and Microsoft CRM to meticulously record each encounter with a target provider.

### 2. Targeting of Providers by Drug Representatives and Nurse Educators

100.    Once trained, the Nurse Educators were all selectively deployed to target high potential Abilify prescribers. Importantly, the targeting activities were based on prescribing habits, and target lists were given to the Nurse Educators, usually identifying the top 20 target accounts. At the day-to-day level, the scheme typically involved each territory's Nurse Educators and drug representatives coordinating sales calls.

101.    Further, the sales representatives' close coordination with Nurse Educators demonstrates the disingenuous nature of the "education" plan. If a Nurse Educator's goal was "education" then there would not be any legitimate reason for coordination between a purportedly independent Nurse Educator, whose role is to educate, and a sales representative. This nexus, along with the other allegations contained herein, illustrate that Otsuka and Lundbeck's true motive in targeting high potential prescribers for "education" was to put the Nurse Educator in a position to influence and increase that provider's Abilify prescriptions.

102.    According to Relator 1, Nurse Educators received a target list of providers and

coordinated with the sales team. Relator 1 received a list of the top 20 accounts and she discussed the lists with the sales representatives. According to CW4, a Nurse Educator, estimates that 80% of the time she would call on providers by herself, with the remaining 20% was spent calling on providers with a drug representative.[10] For example, CW4's target list, titled "Business Plan 2013," states that the top ten targets were "all I got from the East team." CW4 explained that she coordinated with the sales team, which was broken up into the west Kansas City team and the east Kansas City team, and the top ten targets were provided by the east Kansas City sales team.

103.  An email from CW4 also demonstrates the close coordination between Nurse Educators and sales representatives. The email discusses CW4's "business plan" and where CW4, a nurse educator, would be "promoting" Abilify.

104.  The compensation paid to Nurse Educators also demonstrates that they were intended to function as sales representatives. According to Relator 1, Nurse Educators were eligible for bonuses based on metrics which closely correlate to prescription sales, such as provider in-services or slide deck presentations. According to Relator 1, these presentations were called "disease state information," but they were really "product information." In short, Nurse Educator bonus metrics were really metrics regarding the amount of Nurse Educator sales calls.

105.  According to Relator 1, her metrics were 2.5 calls per day as well as 20 in-services per quarter. CW4 had to perform 240 provider slide deck presentations per quarter. CW5's metrics were based on an amount of presentations she performed.[11] CW6's bonus metrics were the amount

---

[10]   CW4 was employed by Publicis under its contract with Otsuka and Lundbeck as an Abilify Nurse Educator from 2012 until 2015.

[11]   CW5 was employed by Publicis under its contract with Otsuka and Lundbeck as an Abilify Nurse Educator Manager from July 2012 until October 2014.

of in-services performed.[12]  CW7 had to interact with 52 providers or providers' staff per week,

visit her top 20 accounts every month, and visit her top 50 accounts every quarter.[13]  CW8's metrics

required her to perform a certain amount of slide deck presentations per quarter.[14]  CW9's metrics

required her to call on at least three accounts per day, and perform a certain amount of presentations

per month.[15]  CW10 had to see a certain amount of providers per quarter, while CW11 had to

perform five face-to-face encounters per day and perform five slide deck presentations per week.[16]

106.    These metrics do not measure, in any meaningful way, patient health outcomes,

efficacy or any other metric unrelated to the amount of sales calls the Nurse Educators were

performing.  Therefore, metrics associated with provider education/presentation sessions, which

are really sales calls, are closely correlated with prescription sales.

### 3. Improper Direct White Coat Marketing to Providers

107.    After training and being provided target lists, Nurse Educators were deployed into

the field to call on targeted providers under the auspices of free education services in order to gain

access to providers to exclusively recommend and promote Abilify over competitors' drugs.

Otsuka and Lundbeck knew and expected that the access gained by its Nurse Educators would

---

[12]    CW6 was employed by Publicis under its contract with Otsuka and Lundbeck as an Abilify
Nurse Educator from July 2012 until December 2014.

[13]    CW7 was employed by Publicis under its contract with Otsuka and Lundbeck as an Abilify
Nurse Educator from 2014 until 2014.

[14]    CW8 was employed by Publicis under its contract with Otsuka and Lundbeck as an Abilify
Nurse Educator Trainer and Manager from 2012 until 2014.

[15]    CW9 was employed by Publicis under its contract with Otsuka and Lundbeck as an Abilify
Nurse Educator from 2012 until 2014.

[16]    CW10 was employed by Publicis under its contract with Otsuka and Lundbeck as an
Abilify Nurse Educator from 2014 until 2014. CW11 was employed by Publicis under its contract
with Otsuka and Lundbeck as an Abilify Nurse Educator from 2012 until 2013.

influence the selection of patients' drugs. By all accounts, Otsuka's and Lundbeck's scheme was successful in that once a Nurse Educator gained access and developed a relationship with a provider, an Abilify prescription would typically follow.

108. The scheme was especially successful at gaining access to providers who would not allow sales calls from sales representatives. In many cases, the Nurse Educators were able to gain access to these providers because they were viewed as clinicians and peers rather than sales representatives. Indeed, in some cases when Otsuka sales representatives could not gain access to a provider, Defendants would deploy a Nurse Educator to call on the provider. In such instances, the Nurse Educator would attempt to create the appearance that he/she was not there for a sales call, but once in the door the focus of the conversation quickly shifted to Abilify. And in cases where being a nurse was not enough to gain access to the provider, many of the Nurse Educators had preexisting relationships with providers which allowed them to gain access. Relator 1 further alleges that when reporting her metrics, there was a checkbox for "representative restricted" providers, meaning Relator 1's ability to gain access to providers was measured by sales representatives' inability to gain access to the same providers and that her discussions were "never non-branded, ever."

109. Another aspect of the Nurse Educator message to providers is that there is a financial incentive to providers to bill for the monthly office visit plus the in-office Abilify injection to patients being treated with Abilify. According to Relator 1, part of her pitch to providers was that because the injectable is given in the office once a month, prescribing Abilify equates to better revenue for the provider as a result of the increased office visits. According to Relator 1, this was discussed "all the time."

110. That the Nurse Educators were actually sales representatives is beyond credible

dispute. According to Relator 1, Nurse Educators were aware that, despite their title, they were actually sales representatives. For example, Nurse Educators knew not to mention a competitor's drug during their discussions with providers, as Defendants made clear that the job of Nurse Educators was to promote Abilify.

111.    Further, Otsuka explicitly recognized that the role of Nurse Educators was to promote Abilify. To demonstrate this, in an email sent to CW4 by Kansas City District Manager Terri Garrett, regarding the termination of the Nurse Educator contract, Garrett states "[y]ou two [including s. CW4] have been so instrumental in getting Abilify Maintena launched in our territories. Our fast start in Kansas and Nebraska can be directly attributed to our strong team of representatives and CNE [Nurse Educator] partners." Thus, it is clear that Defendants intended Nurse Educators to serve as sales representatives, and they did in fact serve in that role.

112.    Defendants' Nurse Educator scheme was very successful. According to CW5, she was shown an Otsuka study which showed the positive impact Nurse Educators had on Abilify's sales.

#### 4.  Otsuka, Lundbeck, and Publicis' Are Prohibited From Deploying Nurse Educators As Sales Representatives

113.    As discussed in more detail, below, Otsuka and Lundbeck are prohibited from deploying Nurse Educators to act as sales representatives. The is due to the important differences between the role of Abilify sales representatives as compared to the role of Nurse Educators, and the rules and regulations that govern and constrain the conduct of each distinct role. Sales representatives promote drugs, and Nurse Educators are supposed to provide disease awareness education. While the FDA regulates drug promotion, it does not place the same constraints on education provided by Nurse Educators.

114.    Drug promotional activity is conduct that contains representations about or

concerning a particular drug, and is known as "branded" activity. Sales representatives live and work in this "branded" territory; and because they are motivated by sales and commissions, the FDA imposes restrictions on branded discussions. For the most part, sales representatives are constrained by the FDA-approved "Package Insert" or "PI" that contains the drug's FDA mandated disclosures (i.e. indications, warnings, side effects, etc.) and other FDA-approved materials. Sales representatives are prohibited from making promotional claims or representations about a drug beyond those in the PI. Further, since the sales representative is a salesman, not a clinician, the FDA prohibits them from making disease awareness claims on matters regarding diet, exercise or other health matters. Because information about health matters are within the province of a Nurse Educator, and because disease awareness education is not part of any FDA-approved materials, sales representatives are prohibited from answering any question regarding treatment options. These compliance guardrails protect consumers' health and welfare from sales representatives who may make claims about a drug that have not been approved by the FDA.

115. Unlike drug promotion, disease awareness education is disseminated to patients and/or providers for a particular disease or health condition, and should not include any discussion of a specific drug. This is known as "non-branded" activity, and because there is no specific drug promotion, the FDA restrictions that bind sales representatives do not apply to Nurse Educators. Rather, Nurse Educators are expected to, and should provide independent, non-product, non-branded related disease awareness education to providers, their staff, and patients. If a Nurse Educator provides "branded" discussions about a specific drug, she is subject to the same FDA constraints as a sales representative, meaning that claims must be within the PI or it is unlawful off-label promotion.

116. When Defendants deployed its Nurse Educators to function as sales representatives,

Defendants' Nurse Educators were subject to the same promotional restrictions as sales representatives. Indeed, the FDA's regulation of pharmaceutical sales representatives would be pointless if companies could bypass those regulations simply by assigning its sales staff an "educator" title. As a result of Defendants' scheme to use Nurse Educators as sales representatives, they were never permitted, in the first place, to provide purportedly "independent" medical advice. However, in this case, Defendants' conduct was especially egregious as Nurse Educators would promote Abilify *immediately after* providing the purported "independent" medical advice. Once a Nurse Educator references a specific drug, the Nurse Educator can no longer use non-approved FDA materials. More importantly, if the Nurse Educator begins branded drug promotion, the Nurse Educator cannot provide independent disease awareness education because that education promotion would not be part of the FDA-approved materials, and would be prohibited off-label promotion. Therefore, the services Defendants' Nurse Educators were providing, such as unbranded disease awareness educations, violated the FDCA because, as stated above, sales representatives are prohibited in engaging in such discussions with providers.

## COUNT I
**(False Claims Act, 31 U.S.C. § 3729 *et seq.*)**

117. Relators' repeat each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

118. As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare, Medicaid, and TriCare by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of kickbacks provided to referring physicians and other improper promotional activities.

119. By virtue of the acts described above, Defendants have violated:

(e)     that this Court order such other and further relief as it deems proper.

## COUNT II
### (California False Claims Act, Cal. Gov't Code § 12650 *et seq.*)

122.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

123.    This is a *qui tam* action brought by Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*

124.    Cal. Gov't Code § 12651(a) provides liability for any person who:

(1)     knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3)     conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(4)     is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

125.    Defendants violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded health care programs.

126.    The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' conduct, paid the claims submitted by health care providers and third party payers in connection therewith.

presented or caused to be presented to the State of California;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT III
### (Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*)

132. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

133. This is a *qui tam* action brought by Relators on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*

134. Colorado's Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*, provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c) Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

48

(d) Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(e) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; ...

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

135.    Defendants violated the Colorado Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

136.    The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

137.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Colorado in connection with Defendants' conduct. Compliance with applicable Colorado statutes was also a condition of payment of claims submitted to the State of Colorado.

138.    Had the State of Colorado known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

139.    As a result of Defendants' violations of the Colorado Medicaid False Claims Act, the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

140.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Colorado Medicaid False Claims Act on behalf of themselves and the State of Colorado.

141.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF COLORADO:

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Colorado;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Colorado Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT IV
### (Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*)

142.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

143.     This is a *qui tam* action brought by Relators on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*

144.     Conn. Gen. Stat. § 17b-301b imposes liability as follows:

(a) No person shall:

(1) Knowingly present, or cause to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

(2) Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

(3) Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

(4) Having possession, custody or control of property or money used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services, and intending to defraud the state or willfully to conceal the property, deliver or cause to be delivered less property than the amount for which the person receives a certificate or receipt;

(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services and intending to defraud the state, make or deliver such document without completely knowing that the information on the document is true;

(6) Knowingly buy, or receive as a pledge of an obligation or debt, public property from an officer or employee of the state relative to a medical assistance program administered by the Department of Social Services, who lawfully may not sell or pledge the property; or

(7) Knowingly make, use or cause to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state under a medical assistance program administered by the Department of Social Services.

145.    Defendants violated the Connecticut False Claims Act and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

146.    The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

147.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Connecticut in connection with Defendants' conduct. Compliance with applicable Connecticut statutes was also a condition of payment of claims submitted to the State of Connecticut.

148.    Had the State of Connecticut known that Defendants were violating the federal and

state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

149. As a result of Defendants' violations of the Connecticut False Claims Act, the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

150. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Connecticut False Claims Act on behalf of themselves and the State of Connecticut.

151. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CONNECTICUT:

(1) Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Connecticut;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.* and/or any other applicable provision of

law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT V
### (Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*)

152.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

153.    This is a *qui tam* action brought by Relators on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*

154.    6 Del. C. § 1201(a) in pertinent part provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or

(d) Conspires to commit one or more of the violations in this subsection (1).

155.    Defendants furthermore violated the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even

eligible for reimbursement by the government-funded healthcare programs.

156. The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

157. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendants' conduct. Compliance with applicable Delaware statutes and regulations was also an express condition of payment of claims submitted to the State of Delaware.

158. Had the State of Delaware known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

159. As a result of Defendants' violations of the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

160. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, on behalf of itself and the State of Delaware.

161. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF DELAWARE:

    (1) Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Delaware;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201, and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT VI
### (Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*)

162. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

163. This is a *qui tam* action brought by Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

164. Fla. Stat. § 68.082(2) provides liability for any person who:

    (a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

56

        (b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

        (c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed-or paid.

165.    Defendants further violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

166.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

167.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Florida in connection with Defendants' conduct. Compliance with applicable Florida statutes was also a condition of payment of claims submitted to the State of Florida.

168.    Had the State of Florida known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

169.    As a result of Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

170.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on

behalf of themselves and the State of Florida.

171.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF FLORIDA:

> (1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' conduct;
>
> (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Florida;
>
> (3) Prejudgment interest; and
>
> (4) All costs incurred in bringing this action.

To Relators:

> (1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;
>
> (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;
>
> (3) An award of reasonable attorneys' fees and costs; and
>
> (4) Such further relief as this Court deems equitable and just.

### COUNT VII
**(Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*)**

172.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

173.    This is a *qui tam* action brought by Relators on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code

Ann., § 49-4-168 *et seq.*

174.   The Georgia False Medicaid Claims Act imposes liability on any person who:

(1)  Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)  Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3)  Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

(4)  Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate of receipt;

(5)  Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6)  Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Georgia Medicaid program who lawfully may not sell or pledge the property; or

(7)  Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay, repay, or transmit money or property to the State of Georgia ....

175.   Defendants violated the Georgia False Medicaid Claims Act and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

176.   The State of Georgia, by and through the Georgia Medicaid program and other state

healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

177.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct. Compliance with applicable Georgia statutes was also a condition of payment of claims submitted to the State of Georgia.

178.    Had the State of Georgia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

179.    As a result of Defendants' violations of the Georgia False Medicaid Claims Act, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

180.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Georgia False Medicaid Claims Act on behalf of themselves and the State of Georgia.

181.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF GEORGIA:

(1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT VIII
**(Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*)**

182. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

183. This is a *qui tam* action brought by Relators on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

184. Section 661-21(a) provides liability for any person who-

a. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

b. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

c. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property

to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State; and

    d. Conspires to commit any of the conduct described in this subsection,

185.    Defendants violated Haw. Rev. Stat. § 661-21(a) and knowingly caused false claims to be made, used and presented to the State of Hawaii by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

186.    The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

187.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes was also a condition of payment of claims submitted to the State of Hawaii.

188.    Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

189.    As a result of Defendants' violations of Haw. Rev. Stat. § 661-21, the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

190.    Relators are private persons with direct and independent knowledge of the

allegations of this Complaint, who have brought this action pursuant to Haw. Rev. Stat. § 661-21 on behalf of themselves and the State of Hawaii.

191.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF HAWAII:

(1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Hawaii;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-21 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT IX
### (Illinois False Claims Act, 740 ILCS 175/1 *et seq.*)

192.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

193.    This is a *qui tam* action brought by Relators on behalf of the State of Illinois to

recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*

194.    740 ILCS 175/3(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

195.    Defendants violated 740 ILCS 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

196.    The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

197.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Illinois in connection with Defendants' conduct. Compliance with applicable Illinois statutes was also a condition of payment of claims submitted to the State of Illinois.

198.    Had the State of Illinois known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to

meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

199.    As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

200.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

201.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants

To the STATE OF ILLINOIS:

> (1) Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;

> (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Illinois;

> (3) Prejudgment interest; and

> (4) All costs incurred in bringing this action.

To Relators:

> (1) The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

> (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT X
**(Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*)**

202.    Relators reallege and incorporate by reference the prior paragraphs as though fully

set forth herein.

203.    This is a *qui tam* action brought by Relators on behalf of the State of Indiana to

recover treble damages and civil penalties under the Indiana False Claims and Whistleblower

Protection Act, Ind. Code 5-11-5.5 *et seq.*, which imposes liability on:

> (b) A person who knowingly or intentionally:
>
> > (1) presents a false claim to the state for payment or approval;
> >
> > (2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;
> >
> > (3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;
> >
> > (4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;
> >
> > (5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;
> >
> > (6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;
> >
> > (7) conspires with another person to perform an act described in subdivisions (1) through (6); or
> >
> > (8) causes or induces another person to perform an act described in subdivisions (1) through (6) ....

204.    Defendants violated Indiana False Claims Act and knowingly caused false claims

to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

205.    The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

206.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Indiana in connection with Defendants' conduct. Compliance with applicable Indiana statutes was also a condition of payment of claims submitted to the State of Indiana.

207.    Had the State of Indiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

208.    As a result of Defendants' violations of Indiana's False Claims Act, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

209.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Ind. Code § 5-11-5.5 *et seq.* on behalf of themselves and the State of Indiana.

210.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF INDIANA:

(1) Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Ind. Code § 5-11-5.5 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XI
### (Iowa False Claims Law, I.C.A. § 685.1 *et seq.*)

211. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

212. This is a *qui tam* action brought by Relators on behalf of the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Law, I.C.A. § 685.1 *et seq.*

213. Iowa False Claims Law, I.C.A. § 685.2, in pertinent part provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(c) Conspires to commit a violation of paragraph "a", "b", "d", "e", "f", or "g".

214.    Defendants violated the Iowa False Claims Law, I.C.A. § 685.1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of Iowa by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

215.    The State of Iowa, by and through the Iowa Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

216.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Iowa in connection with Defendants' conduct. Compliance with applicable Iowa statutes was also a condition of payment of claims submitted to the State of Iowa.

217.    Had the State of Iowa known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

218.    As a result of Defendants' violations of the Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, the State of Iowa has been damaged in an amount far in excess of millions of dollars

exclusive of interest.

219.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, on behalf of themselves and the State of Iowa.

220.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF IOWA:

(1) Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Iowa;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XII
### (Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*)

221.     Relators reallege and incorporate by reference the prior paragraphs as though fully

70

set forth herein.

222.    This is a *qui tam* action brought by Relators on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*

223.    La. Rev. Stat. Ann. § 438.3 provides-

    (A) No person shall knowingly present or cause to be presented a false or fraudulent claim;

    (B) No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;

    (C) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

224.    Defendants further violated La. Rev. Stat. Ann. §438.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

225.    The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

226.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' conduct. Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

71

227.    Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

228.    As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3, the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

229.    Relators are private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. §439.1(A) on behalf of itself and the State of Louisiana.

230.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF LOUISIANA:

(1) Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

72

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XIII
**(Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*)**

231.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

232.    This is a *qui tam* action brought by Relators on behalf of the State of Maryland to recover treble damages and civil penalties under the Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*

233.    Section 2-602 of Maryland's False Claims Act imposes liability as follows:

(a) A person may not:

(1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspire to commit a violation under this subtitle;

(4) Have possession, custody, or control of money or other property used by or on behalf of the State under a State health plan or a State health program and knowingly deliver or cause to be delivered to the State less than all of that money or other property;

(5) (i) Be authorized to make or deliver a receipt or other document certifying receipt of money or other property used or to be used by the State under a State health plan or a State health program; and (ii) Intending to defraud the State or the Department, make or deliver a receipt or document knowing that the information contained in the receipt or document is not true;

(6) Knowingly buy or receive as a pledge of an obligation or debt

publicly owned property from an officer, employee, or agent of a State health plan or a State health program who lawfully may not sell or pledge the property;

(7) Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State;

(8) Knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State; or

(9) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

234.     Defendants violated the Maryland False Claims Act, and knowingly caused false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

235.     The State of Maryland, by and through the Maryland Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

236.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' conduct. Compliance with applicable Maryland statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Maryland.

237.     Had the State of Maryland known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were

premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

238.   As a result of Defendants' violations of the Maryland False Claims Act, the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

239.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Maryland False Claims Act on behalf of itself and the State of Maryland.

240.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF MARYLAND:

    (1) Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Maryland;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Maryland False Claims Act and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XIV
### (Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*)

241.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

242.    This is a *qui tam* action brought by Relators on behalf of the State of Michigan to recover treble damages and civil penalties under Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*, which provides in pertinent part as follows:

> Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits;

> (2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit ....

243.    Defendants violated Michigan law and knowingly caused false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

244.    The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

245.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Michigan in connection with Defendants' conduct. Compliance with applicable Michigan statutes was also a condition of payment of claims submitted to the State of

Michigan.

246. Had the State of Michigan known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

247. As a result of Defendants' violations of the Medicaid False Claims Act, the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

248. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Medicaid False Claims Act on behalf of themselves and the State of Michigan.

249. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MICHIGAN:

    (1) Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to the Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XV
### (Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*)

250.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

251.    This is a *qui tam* action brought by Relators on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, M.S.A. § 15C.01 *et seq*.

252.    Minnesota False Claims Act, M.S.A. § 15C.02, provides for liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

(3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim;

(4) has possession, custody, or control of public property or money used, or to be used, by the state or a political subdivision and knowingly delivers or causes to be delivered to the state or a political subdivision less money or property than the amount for which the person receives

a receipt;

(5) is authorized to prepare or deliver a receipt for money or property used, or to be used, by the state or a political subdivision and knowingly prepares or delivers a receipt that falsely represents the money or property;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state or a political subdivision who lawfully may not sell or pledge the property; or

(7) knowingly makes or uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or a political subdivision.

253.     Defendants violated the Minnesota False Claims Act and knowingly caused false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

254.     The State of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

255.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Minnesota in connection with Defendants' conduct. Compliance with applicable Minnesota statutes was also a condition of payment of claims submitted to the State of Minnesota.

256.     Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were

premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

257.     As a result of Defendants' violations of the Minnesota False Claims Act, the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

258.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Minnesota False Claims Act on behalf of themselves and the State of Minnesota.

259.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MINNESOTA:

    (1) Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Minnesota False Claims Act and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVI
### (Montana False Claims Act, MCA § 17-8-401 *et seq.*)

260.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

261.    This is a *qui tam* action brought by Relators on behalf of the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MCA § 17-8-401 *et seq.*

262.    Montana's False Claims Act, MCA § 17-8-403, provides for liability for any person who:

(a) knowingly presents or causes to be presented to an officer or employee of the governmental entity a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the governmental entity;

(c) conspires to defraud the governmental entity by getting a false or fraudulent claim allowed or paid by the governmental entity;

(d) has possession, custody, or control of public property or money used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, delivers or causes to be delivered less property or money than the amount for which the person receives a certificate or receipt;

(e) is authorized to make or deliver a document certifying receipt of property used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, makes or delivers a receipt without knowing that the information on the receipt is true;

(f) knowingly buys or receives as a pledge of an obligation or debt public property of the governmental entity from any person who may not lawfully sell or pledge the property;

(g) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors; or

(h) as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

263. Defendants violated the Montana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Montana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

264. The State of Montana, by and through the Montana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

265. Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Montana in connection with Defendants' conduct. Compliance with applicable Montana statutes was also a condition of payment of claims submitted to the State of Montana.

266. Had the State of Montana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

267.     As a result of Defendants' violations of the Montana False Claims Act, the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

268.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Montana False Claims Act on behalf of themselves and the State of Montana.

269.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MONTANA:

(1) Three times the amount of actual damages which the State of Montana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Montana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Montana False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVII
**(Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*)**

270.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

271.     This is a *qui tam* action brought by Relators on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*

272.     N.R.S. § 357.040(1) provides liability for any person who -

   (a) knowingly presents or causes to be presented a false claim for payment or approval;

   (b) knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

   (c) conspires to defraud by obtaining allowance or payment of a false claim;

   (h) is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

273.     Defendants violated N.R.S. § 357.040(1) and knowingly false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

274.     The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

275.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Nevada in connection with Defendants' conduct. Compliance with applicable Nevada statutes was also a condition of payment of claims submitted to the State of

Nevada.

276.     Had the State of Nevada known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

277.     As a result of Defendants' violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

278.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of themselves and the State of Nevada.

279.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the STATE OF NEVADA:

    (1) Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Nevada;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

<u>COUNT XVIII</u>
**(New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*)**

280. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

281. This is a *qui tam* action brought by Relators on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*

282. N.J.S.A. § 2A:32C-3, provides for liability for any person who:

(a) Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

(d) Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(e) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

(f) Knowingly buys, or receives as a pledge of an obligation or debt, public

property from any person who lawfully may not sell or pledge the property; or

(g) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

283.    Defendants violated the New Jersey False Claims Act and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

284.    The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

285.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Jersey in connection with Defendants' conduct. Compliance with applicable New Jersey statutes was also a condition of payment of claims submitted to the State of New Jersey.

286.    Had the State of New Jersey known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

287.    As a result of Defendants' violations of the New Jersey False Claims Act, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of

interest.

288.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the New Jersey False Claims Act on behalf of themselves and the State of New Jersey.

289.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW JERSEY:

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of New Jersey;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to New Jersey False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XIX
**(New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*;
New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*)**

290.    Relators reallege and incorporate by reference the prior paragraphs as though fully

set forth herein.

291.    This is a *qui tam* action brought by Relators on behalf of the State of New Mexico

to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act,

which provides in pertinent part as follows:

A person shall not:

(1)  knowingly present, or cause to be presented, to an employee, officer or
agent of the state or to a contractor, grantee, or other recipient of state
funds, a false or fraudulent claim for payment or approval;

(2)  knowingly make or use, or cause to be made or used, a false, misleading
or fraudulent record or statement to obtain or support the approval of
or the payment on a false or fraudulent claim;

(3)  conspire to defraud the state by obtaining approval or payment on a
false or fraudulent claim . . . .

N.M. Stat. Ann. § 44-9-3(A)(1)-(3).

292.    Defendants violated N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-

9-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New

Mexico by its deliberate and systematic violation of federal and state laws and by virtue of the fact

that none of the claims submitted in connection with its conduct were even eligible for

reimbursement by the government-funded healthcare programs.

293.    The State of New Mexico, by and through the New Mexico Medicaid program and

other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted

by healthcare providers and third party payers in connection therewith.

294.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid

and the various other federal and state laws cited herein was a condition of payment of claims

submitted to the State of New Mexico in connection with Defendants' conduct. Compliance with

applicable New Mexico statutes was also a condition of payment of claims submitted to the State

of New Mexico.

295.    Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

296.    As a result of Defendants' violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.*, the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

297.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* on behalf of themselves and the State of New Mexico.

298.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW MEXICO:

      (1) Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' conduct;

      (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;

      (3) Prejudgment interest; and

      (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.*
        and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection
        with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT XX
### (New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*)

299.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

300.    This is a *qui tam* action brought by Relators on behalf of the State of New York to recover treble damages and civil penalties under the New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*, which imposes liability on any person who:

    (a) knowingly presents, or causes to be presented, to any employee, officer
        or agent of the state or local government, a false or fraudulent claim for
        payment or approval;

    (b) knowingly makes, uses, or causes to be made or used, a false record or
        statement to get a false or fraudulent claim paid or approved by the state
        or local government; or

    (c) conspires to defraud the State by getting a false or fraudulent claim
        allowed or paid.

301.    Defendants violated the New York State False Claims Act, and knowingly caused false claims to be made, used and presented to the State of New York, by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

302.    The State of New York, by and through the New York Medicaid program and other

state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

303.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New York in connection with Defendants' conduct. Compliance with applicable New York statutes was also a condition of payment of claims submitted to the State of New York.

304.    Had the State of New York known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

305.    As a result of Defendants' violations of the New York State False Claims Act, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

306.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the New York State False Claims Act, on behalf of themselves and the State of New York.

307.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW YORK:

    (1) Three times the amount of actual damages which the State of New York has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New York;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to the New York State False Claims Act, and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT XXI
### (North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*)

308. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

309. This is a *qui tam* action brought by Relators on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*

310. North Carolina's False Claims Act, N.C.G.S.A. § 1-607, provides for liability for any person who:

    (1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

    (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

93

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section;

(4) Has possession, custody, or control of property or money used or to be used by the State and knowingly delivers or causes to be delivered less than all of that money or property;

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any officer or employee of the State who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

311. Defendants violated the North Carolina False Claims Act, and knowingly caused false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

312. The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

313. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendants' conduct. Compliance with applicable North Carolina statutes, regulations and Pharmacy Manuals

was also an express condition of payment of claims submitted to the State of North Carolina.

314.    Had the State of North Carolina known that Defendants was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

315.    As a result of Defendants' violations of the North Carolina False Claims Act, the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

316.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the North Carolina False Claims Act on behalf of itself and the State of North Carolina.

317.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NORTH CAROLINA:

(1) Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of North Carolina;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to North Carolina False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXII
### (Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*)

318. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

319. This is a *qui tam* action brought by Relators on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*

320. Oklahoma's Medicaid False Claims Act, 63 Okl. St. Ann. § 5053.1, provides for liability for any person who:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

(4) Has possession, custody, or control of property or money used, or to be used, by the state and, intending to defraud the State or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the State and, intending to defraud the

State, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

321.    Defendants violated the Oklahoma Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

322.    The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

323.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendants' conduct. Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Oklahoma.

324.    Had the State of Oklahoma known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

325. As a result of Defendants' violations of the Oklahoma Medicaid False Claims Act, the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

326. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Oklahoma Medicaid False Claims Act on behalf of itself and the State of Oklahoma.

327. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF OKLAHOMA:

(1) Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Oklahoma;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Oklahoma Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXIII
### (Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*)

328.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

329.    This is a *qui tam* action brought by Relators on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*

330.    Rhode Island's False Claims Act, Gen. Laws 1956, § 9-1.1-3, provides for liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;
>
> (3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid;
>
> (4) has possession, custody, or control of property or money used, or to be used, by the state and, intending to defraud the state or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;
>
> (5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;
>
> (6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the guard, who lawfully may not sell or pledge the property; or
>
> (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state.

331.    Defendants violated the Rhode Island False Claims Act and knowingly caused false

claims to be made, used and presented to the State of Rhode Island by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

332.  The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

333.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendants' conduct.  Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Rhode Island.

334.  Had the State of Rhode Island known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

335.  As a result of Defendants' violations of the Rhode Island False Claims Act, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

336.  Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Rhode Island False Claims Act on behalf of itself and the State of Rhode Island.

337. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF RHODE ISLAND:

(1) Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Rhode Island;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Rhode Island False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXIV
### (Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)

338. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

339. This is a *qui tam* action brought by Relators on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

101

340.    Section 71-5-182(a)(1) provides liability for any person who:

    a. presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

    b. makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

    c. conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

341.    Defendants violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

342.    The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

343.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Tennessee in connection with Defendants' conduct. Compliance with applicable Tennessee statutes was also a condition of payment of claims submitted to the State of Tennessee.

344.    Had the State of Tennessee known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

345.    As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

346.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of themselves and the State of Tennessee.

347.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TENNESSEE:

(1) Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Tennessee;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXV

**(Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*)**

348.   Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

349.   This is a *qui tam* action brought by Relators on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

350.   V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who –

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

    (a) on an application for a contract, benefit, or payment under the Medicaid program; or

    (b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program

(2) knowingly or intentionally concealing or failing to disclose an event:

    (a) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of:

        (i) the person, or

        (ii) another person on whose behalf the person has applied   for   a benefit or payment or is receiving a benefit or payment; and

    (b) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

\* \* \*

(4) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

\* \* \*

    (b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

104

351.     Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

352.     The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

353.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct. Compliance with applicable Texas statutes was also a condition of payment of claims submitted to the State of Texas.

354.     Had the State of Texas known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

355.     As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

356.     Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and

has not otherwise furnished information to the State regarding the claims for reimbursement at issue.

357.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

358.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TEXAS:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim which Defendants cause to be presented to the state of Texas;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXVI

**(Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*)**

359.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

360.     This is a *qui tam* action brought by Relators on behalf of the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*

361.     Vt. Stat. Ann. tit. 32, § 631 in pertinent part provides for liability for any person who:

> (1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;
>
> (2) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (3) knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 or section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b;
>
> (4) knowingly present, or cause to be presented, a claim that includes items or services for which the State could not receive payment from the federal government due to the operation of 42 U.S.C. § 1396b(s) because the claim includes designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) furnished to an individual on the basis of a referral that would result in the denial of payment under 42 U.S.C. chapter 7, subchapter XVIII (the "Medicare program"), due to a violation of 42 U.S.C. § 1395nn;
>
> (5) knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;
>
> (6) knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State; or
>
> (7) conspire to commit a violation of this subsection.

362.     Defendants furthermore violated the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Vermont by its

107

deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

363.　The State of Vermont, by and through the Vermont Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

364.　Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Vermont in connection with Defendants' conduct. Compliance with applicable Vermont statutes and regulations was also an express condition of payment of claims submitted to the State of Vermont.

365.　Had the State of Vermont known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

366.　As a result of Defendants' violations of the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, the State of Vermont has been damaged in an amount far in excess of millions of dollars exclusive of interest.

367.　Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, on behalf of itself and the State of Vermont.

368.　This Court is requested to accept pendant jurisdiction of this related state claim as

it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF VERMONT:

(1) Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Vermont;

(3) Prejudgment interest; and

(4) All costs incurred in investigating and bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXVII
**(Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*)**

369.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

370.    This is a *qui tam* action brought by Relators on behalf of the State of Washington to recover treble damages and civil penalties under the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*

371.    RCWA 74.66.020 in pertinent part provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(c) Conspires to commit one or more of the violations in this subsection (1).

372.    Defendants furthermore violated the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq*., and knowingly caused false claims to be made, used and presented to the State of Washington by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

373.    The State of Washington, by and through the Washington Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

374.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Defendants' conduct. Compliance with applicable Washington statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Washington.

375.    Had the State of Washington known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

376.    As a result of Defendants' violations of the Washington Medicaid Fraud Act, Wash.

Rev. Code Ann. § 74.66.005 *et seq.*, the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

377. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.* on behalf of itself and the State of Washington.

378. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF WASHINGTON:

    (1) Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.* and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT XXVIII
### (Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*)

379.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

380.    This is a *qui tam* action brought by Relators on behalf of the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*

381.    The Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.* provides for liability for any person who:

> (a) Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.
> (b) Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.
>
> (c) Conspires to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program.
>
>         * * *
>
> Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance program.
>
> (g) Is a beneficiary of the submission of a false claim for medical assistance to any officer, employee, or agent of this state, knows that the claim is false, and fails to disclose the false claim to this state within a reasonable time after the person becomes aware that the claim is false.

382.    Defendants violated the Wisconsin False Claims Act and knowingly caused false claims to be made, used and presented to the State of Wisconsin by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded

healthcare programs.

383.    The State of Wisconsin, by and through the Wisconsin Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

384.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Wisconsin in connection with Defendants' conduct. Compliance with applicable Wisconsin statutes was also a condition of payment of claims submitted to the State of Wisconsin.

385.    Had the State of Wisconsin known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

386.    As a result of Defendants' violations of the Wisconsin False Claims Act, the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

387.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Wisconsin False Claims Act on behalf of themselves and the State of Wisconsin.

388.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Wisconsin in the operation of its Medicaid program.

113

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF WISCONSIN:

(1) Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Wisconsin;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Wisconsin False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XXIX
**(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*)**

389.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

390.    This is a *qui tam* action brought by Relators on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*

391.    Mass. Gen. Laws Ann. Ch. 12 § 5B provides liability for any person who-

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or

statement to obtain payment or approval of a claim by the commonwealth; or

(3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

\* \* \*

(9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

392. Defendants violated Mass. Gen. Laws Ann. Ch. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

393. The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

394. Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct. Compliance with applicable Massachusetts statutes was also a condition of payment of claims submitted to the Commonwealth of Massachusetts.

395. Had the Commonwealth of Massachusetts known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that

conduct.

396.    As a result of Defendants' violations of Mass. Gen. Laws Ann. Ch. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

397.    Relators are private persons with direct and independent knowledge of the allegations in this Complaint, who have brought this action pursuant to Mass. Gen. Laws Ann. Ch. 12 § 5(c)(2) on behalf of themselves and the Commonwealth of Massachusetts.

398.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the Commonwealth OF MASSACHUSETTS:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Massachusetts;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Ch. 12, § 5F and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXX
### (Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*)

399.　Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

400.　This is a *qui tam* action brought by Relators on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*, which provides liability for any person who-

      (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

      (2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or

      (3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

                * * *

      (5) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

401.　Defendants furthermore violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3a, and knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

402.　The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims

submitted by healthcare providers and third party payers in connection therewith.

403.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' conduct.  Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

404.    Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

405.    As a result of Defendants' violations of Virginia's Fraud Against Tax Payers Act, §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

406.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia's Fraud Against Tax Payers Act, §8.01-216.3, on behalf of itself and the Commonwealth of Virginia.

407.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the COMMONWEALTH OF VIRGINIA:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to VA Code Ann. § 32.1-315 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXI
### (District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*)

408.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

409.    This is a *qui tam* action brought by Relators and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*

410.    D.C. Code § 2-308.14(a) provides liability for any person who-

(1) knowingly presents, or causes to be presented, to an officer or employee of the District, a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

(3) conspires to defraud the District by getting a false claim allowed or paid by the District;

* * *

is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

411. Defendants violated D.C. Code § 2-308.14(a) and knowingly caused false claims to be made, used and presented to the District of Columbia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the government-funded healthcare programs.

412. The District of Columbia, by and through the District of Columbia Medicaid program and other District healthcare programs, and unaware of Defendants' illegal conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

413. Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the District of Columbia in connection with Defendants' conduct. Compliance with applicable District of Columbia statutes was also a condition of payment of claims submitted to the District of Columbia.

414. Had the District of Columbia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

415. As a result of Defendants' violations of D.C. Code § 2-308.14(a), the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

416. Relators are private persons with direct and independent knowledge of the

allegations of this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of themselves and the District of Columbia.

417.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the DISTRICT OF COLUMBIA:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' illegal conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the District of Columbia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMANDED

418.    Relators demand a jury trial.


DATED: February 6, 2017                          Respectfully submitted,

**THE LAW OFFICE OF NORMAN RIFKIND**

Norman Rifkind
100 E Huron Street, #1306
Chicago, Illinois 60611
Telephone: (847) 372-4747

*Local Counsel for Relators*

**THE WEISER LAW FIRM, P.C.**
CHRISTOPHER L. NELSON
cln@weiserlawfirm.com
JAMES M. FICARO
jmf@weiserlawfirm.com
ROSS M. WOLFE
rmw@weiserlawfirm.com
22 CASSATT AVENUE
BERWYN, PA 19312
TEL: (610) 225-2677
FAX: (610) 408-8062

*Attorneys for Relators*